STATE OF CONNECTICUT *v.* CHARLES DeMARTIN

HOUSE, C. J., COTTER, LOISELLE, BOGDANSKI and BARBER, Js.

Argued June 3—decision released September 7, 1976

*Anthony J. Lasala,* for the appellant (defendant).

*William F. Gallagher,* special assistant state's attorney, with whom, on the brief, were *Arnold Markle,* state's attorney, and *John J. Kelly,* assistant state's attorney, for the appellee (state).

COTTER, J. The defendant was convicted, after a trial to the jury, of conspiracy to commit the crime of policy playing, in violation of former § 54-197 of the General Statutes. On appeal he has challenged certain of the trial court's rulings on evidence, as well as the denial of his motion to dismiss the information.

From a review of the evidence, the jury could have found the following facts: Beginning on August 25, 1971, an undercover police officer succeeded in ingratiating himself with persons involved in policy playing operations in the New Haven and outlying areas. On September 27, 1971, the officer met with the defendant and one John Taddei[1] to discuss the officer's efforts to set himself up in the policy playing operation. At that meeting, the defendant made a series of threats against the officer in the event it should be discovered that he was a policeman. The officer responded that his life was an open book and that he was only in it for the money. The defendant, apparently satisfied by this reply, then said: "Okay, here's how I do it," and described how the officer would be set up in the operation.

Later that day, at the defendant's instructions, Taddei told the officer to call in his "action" to a certain telephone number every day between noon and 1 p.m. The officer was told that he should identify himself as "Peanuts" and that the person on the other end, who would identify himself as "Roger," would be expecting his calls.

[1] John Taddei, along with five other men whom the officer had contacted during the investigation, were named, but not charged, in the informations.

On September 28, 29 and 30, the officer called in a series of fictitious bets to "Roger" and made tapes of these conversations, which were admitted into evidence along with a tape of a September 26 conversation between the officer and John Taddei. Transcripts of these four conversations were also submitted to the jury.[2]

On September 30, the officer made arrangements to meet with Taddei the next day, and at that October 1 meeting Taddei gave the officer $80 to pay off a winning policy number from the preceding day's action. This $80 was admitted into evidence for the limited purpose of showing the intention of the parties on September 30, but, in the final charge to the jury, the trial court reversed itself and instructed the jury to disregard the $80 payment as well as evidence concerning the conversation between the officer and Taddei on October 1. The officer's undercover operation concluded on October 4, 1971.

I

The conspiracy was alleged to have taken place between August 25, 1971, and October 4, 1971.[3]

---

[2] The officer also taped his telephone conversations to "Roger" of October 1 through October 4, but in view of the trial court's decision to exclude evidence which occurred after September 30, these tapes and transcripts were not submitted to the jury.

[3] The original information in this case, dated November 8, 1971, charged the defendant with conspiracy to commit the crime of policy playing in violation of General Statutes § 54-197. A later information, dated August 28, 1972, is identical in all respects except that the defendant is charged with violating General Statutes § 53a-48 (a), as amended by 1971 Public Acts, No. 871. On March 14, 1974, the court granted the state's motion to prosecute under the original information which charged a violation of General Statutes § 54-197.

Connecticut's conspiracy statute[4] was repealed, effective October 1, 1971, upon adoption of a new "Penal Code," § 53a-1, and a new conspiracy statute, General Statutes § 53a-48,[5] became effective. The trial court therefore excluded all evidence of events which occurred from October 1 through October 4 and permitted the state to proceed under the original information, charging the defendant with conspiracy under General Statutes § 54-197, instead of under the new § 53a-48 (a) of the General Statutes.

The defendant challenges the state's right to charge him under General Statutes § 54-197 after its effective repeal date, i.e., October 1, 1971, along with the admission of evidence as to events of October 1.

With respect to the state's power to charge under General Statutes § 54-197, General Statutes § 54-194 is dispositive, for it provides that: "[t]he repeal of any statute defining or prescribing the punishment for any crime shall not affect any pending

---

[4] Former General Statutes § 54-197.   "Any person who combines, confederates or agrees with another or others to accomplish any unlawful object by lawful means, or any lawful object by unlawful means, or any unlawful object by unlawful means, if one or more of such persons do any act in furtherance of such combine, confederation or agreement, shall be fined not more than five thousand dollars or imprisoned not more than fifteen years or both, provided, if the crime which is the object of such combination, confederation or agreement is a misdemeanor, such person shall be subject to the same penalty as is provided by statute for the commission of the misdemeanor. No officer or member of any lawful organization shall be held liable for the unlawful acts of individual officers, members or agents of such organization except upon proof of participation in or authorization of such acts or of the ratification thereof."

[5] General Statutes § 53a-48.   (a) "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy. . . ."

prosecution or any existing liability to prosecution and punishment therefor, unless expressly provided in the repealing statute that such repeal shall have that effect." "[W]hen such a saving provision exists, a crime committed prior to the effective date of the repealing act remains punishable under the terms of the prior statute." *State* v. *Pastet,* 169 Conn. 13, 22, 363 A.2d 41; *United States* v. *Reisinger,* 128 U.S. 398, 401, 9 S. Ct. 99, 32 L. Ed. 480; *Dortch* v. *State,* 142 Conn. 18, 29, 110 A.2d 471; see also 73 Am. Jur. 2d, Statutes, § 422; 1A Sutherland (4th Ed.), Statutory Construction §§ 23.36—23.38, and cases cited therein. There was no error in charging the defendant under General Statutes § 54-197.

Nor is there any error in the trial court's limited admission and subsequent exclusion of evidence of events of October 1, i.e., the conversation between the officer and Taddei and the $80 which Taddei paid the officer. Although the court had barred the state from presenting evidence of a conspiracy which took place after September 30, this October 1 evidence was initially admitted for the limited purpose of showing the intention of the parties on September 30, the day a bet winning $80 was phoned in by the officer. The trial court, in its charge to the jury, however, reversed itself and told the jury to disregard this October 1 evidence and to consider only events which occurred on or up to September 30. In light of the strong and explicit language of the charge,[6] as well as a review of the particular

---

[6] The court charged the jury in pertinent part as follows: "I had allowed some evidence in at that time, at the time of the trial, for limited purposes. In reviewing that at this time, and for purposes of this charge, I am now instructing you to disregard that. You cannot consider it. You must limit your consideration to the evidence of acts and facts which occurred on or up to September 30. What

evidence challenged by the defendant, we cannot say that the defendant was prejudiced by the limited admission and then exclusion of the October 1 evidence; any error in its admission was cured by the trial court's charge. *State* v. *Pikul,* 150 Conn. 195, 198, 187 A.2d 442; *State* v. *Buonomo,* 88 Conn. 177, 90 A. 225; see also *Pennsylvania Co.* v. *Roy,* 102 U.S. 451, 458–59, 26 L. Ed. 141; *Veney* v. *State,* 251 Md. 182, 197–98, 246 A.2d 568, cert. denied, 394 U.S. 948, 89 S. Ct. 1284, 22 L. Ed. 2d 482.

## II

The defendant claims error in the denial of his motion to dismiss the information on the ground that under Wharton's rule[7] the crime of policy playing is of such a character that one can be charged only for a substantive violation of the statute and not for conspiracy. We cannot agree.

In its most recent formulation, Wharton's rule reads as follows: "An agreement by two persons to commit a crime cannot be prosecuted as a conspiracy when the crime is of such a nature as to necessarily require the participation of two persons for its commission." 1 Wharton, Criminal Law & Procedure (Anderson Ed.) § 89, p. 191, cited in

happened on October 1st between Taddei and the officer must be disregarded. It cannot be used in evidence against this defendant and if you should consider it, your verdict would be an improper one. You are not entitled to, and you should not consider that evidence. In that respect, I'm going to strike from the list of exhibits, for example, the $80 that was admitted in evidence as an alleged payment on October 1st. You should disregard all of this evidence. If you're going to find the defendant guilty, you're going to have to do it on the basis of what happened up to and through September 30th."

[7] "Wharton's Rule owes its name to Francis Wharton, whose treatise on criminal law identified the doctrine and its fundamental rationale." *Iannelli* v. *United States,* 420 U.S. 770, 773, 95 S. Ct. 1284, 43 L. Ed. 2d 616; *State* v. *Acklin,* 171 Conn. 105, 117 n.3, 368 A.2d 212.

*State* v. *Acklin,* 171 Conn. 105, 117, 368 A.2d 212. Differently put, the principle is that "where a crime can only be committed by the concurrence of two parties, they must be charged with its commission and not with a conspiracy to commit it." *State* v. *Kemp,* 126 Conn. 60, 81, 9 A.2d 63; *State* v. *Acklin,* supra; *State* v. *McLaughlin,* 132 Conn. 325, 335, 44 A.2d 116.

In a recent opinion, the United States Supreme Court reviewed Wharton's rule at length and declined to hold that the doctrine required reversal of a conviction for conspiracy to violate a federal antigambling statute. *Iannelli* v. *United States,* 420 U.S. 770, 95 S. Ct. 1284, 43 L. Ed. 2d 616. As the court noted: "The classic Wharton's Rule offenses—adultery, incest, bigamy, dueling—are crimes that are characterized by the general congruence of the agreement and the completed substantive offense. The parties to the agreement are the only persons who participate in commission of the substantive offense, and the immediate consequences of the crime rest on the parties themselves rather than on society at large." Id., 782; *United States* v. *Bobo,* 477 F.2d 974, 987 (4th Cir.); *State* v. *Acklin,* supra.

The court concluded that "Wharton's Rule applies only to offenses that *require* concerted criminal activity, a plurality of criminal agents. In such cases, a closer relationship exists between the conspiracy and the substantive offense because *both* require collective criminal activity." (Emphasis in original.) *Iannelli* v. *United States,* supra, 785.

It is true that gambling generally involves the participation not only of bettors but also of people who accept and process these bets. The policy playing statute in effect at the time of this

conspiracy,[8] former § 53-298 of the General Statutes, is specifically drawn, however, and seeks to punish only those persons in the latter category and not the bettors. From a reading of this statute, it is also apparent that one may commit a substantive violation of § 53-298 without necessarily conspiring to do so, just as one may conspire with another to violate the statute without actually committing the substantive policy playing offense. For these reasons, a substantive violation of § 53-298 and a conspiracy to violate that statute do not require collective or concerted activity in the same sense as adultery, incest, bigamy, dueling, or any other Wharton's rule offense. *Iannelli* v. *United States,* supra, 785.

Our holding on this issue is consistent with *State* v. *McLaughlin,* supra, 335, in which we upheld a conviction for conspiracy to operate a telegraph and telephone apparatus for transmitting and receiving information concerning horse races upon which bets were to be placed. It was noted in that case that the legislature intended to punish only those who were transmitting the betting information and not those who received it, and in *State* v. *Faillace,* 134 Conn. 181, 185, 56 A.2d 167, we similarly observed "that persons can set up a dice game and thus violate" a gambling statute "even though no customers are obtained." See also *State* v. *Kemp,* supra.

[8] Former § 53-298 of the General Statutes read in pertinent part that "[a]ny person, whether a principal, agent or servant, who . . . writes, sells, bargains, exchanges, gives, transfers, delivers, buys, collects or receives, or is concerned in writing, selling, bargaining, exchanging, giving, transferring, delivering or receiving, any policy slips, tickets, tokens, numbers or chances, used in said game of chance, business, scheme or occupation . . . shall be fined not more than one thousand dollars or imprisoned not more than one year, or both." This statute was repealed by 1973 Public Acts, No. 73-455, § 9, effective October 1, 1973.

The policy reasons for permitting prosecution for conspiracy under such circumstances were best summed up by Mr. Justice Powell in *Iannelli,* where he wrote (p. 784): "Unlike the consequences of the classic Wharton's Rule offenses, the harm attendant upon the commission of the substantive offense is not restricted to the parties to the agreement. Large-scale gambling activities seek to elicit the participation of additional persons—the bettors—who are parties neither to the conspiracy nor to the substantive offense that results from it. Moreover, the parties prosecuted for the conspiracy need not be the same persons who are prosecuted for commission of the substantive offense. An endeavor as complex as a large-scale gambling enterprise might involve persons who have played appreciably different roles, and whose level of culpability varies significantly. It might, therefore, be appropriate to prosecute the owners and organizers of large-scale gambling operations both for the conspiracy and for the substantive offense but to prosecute the lesser participants only for the substantive offense."

This statement is logically persuasive when applied to the present case. The trial court did not err in denying the defendant's motion to dismiss the information on the ground it violated Wharton's rule.

### III

Before trial, the defendant unsuccessfully moved to suppress (1) three tapes made by the officer of his telephone calls to "Roger" on September 28, 29, and 30, and (2) the tape of a September 26 conversation between the officer and John Taddei. The defendant also moved to suppress the transcripts of these conversations. The basis of his objection

was that the tapes and transcripts were obtained without regard to the wiretapping and electronic surveillance statute, General Statutes §§ 54-41a—54-41s. We cannot agree.

## A

Present federal and state wiretapping and eavesdropping statutes were drafted in response to a series of United States Supreme Court decisions which broke with the past and stated that one's conversations were protected from illegal "seizure" within the meaning of the fourth amendment to the United States constitution: *Berger* v. *New York,* 388 U.S. 41, 87 S. Ct. 1873, 18 L. Ed. 2d 1040; *Katz* v. *United States,* 389 U.S. 347, 88 S. Ct. 507, 19 L. Ed. 2d 576, and *Osborn* v. *United States,* 385 U.S. 323, 87 S. Ct. 429, 17 L. Ed. 2d 394. In order to consider the defendant's statutory claims, we must first examine the constitutional background of wiretapping in light of *Berger, Katz, Osborn* and preexisting case law.

In *Berger,* the court invalidated a New York statute which authorized wiretapping and eavesdropping because the statute contained a "blanket grant of permission to eavesdrop . . . without adequate judicial supervision or protective procedures." Id., 60. It was noted, in particular, that the statute permitted eavesdropping without requiring the belief that a particular offense had been or was being committed and without the need that the conversations sought be particularly described; that the eavesdropping was authorized for a two-month period, with extensions permitted; that there was no termination date specified once the conversation sought was actually seized; and that there was no requirement for notice as there was with conventional warrants. Id., 55–60.

*Katz,* decided six months later, overruled *Olmstead* v. *United States,* 277 U.S. 438, 48 S. Ct. 564, 72 L. Ed. 944, and *Goldman* v. *United States,* 316 U.S. 129, 62 S. Ct. 993, 86 L. Ed. 1322, and held that the fourth amendment protects a person from unreasonable seizure of his conversations from a place where he has a "reasonable expectation of privacy"; id., 351; regardless of whether there was a physical trespass, because the "Fourth Amendment protects people, not places." Id., 351–52. The court noted, however, that surveillance of communications to accommodate "the legitimate needs of law enforcement" may be authorized by judicial order issued in accordance with appropriate fourth amendment standards. Id., 356.

*Osborn,* a case decided prior to *Berger* and *Katz* and upon which each relied to some degree; see *Berger,* supra, 63; *Katz,* supra, 355–56; stated (p. 329–30) that under "precise and discriminate circumstances," a federal court could empower agents to use concealed electronic devices "for the narrow and particularized purpose of ascertaining the truth of the . . . allegations" of a "detailed factual affidavit alleging the commission of a specific criminal offense."

Prior to *Berger, Katz* and *Osborn,* however, the Supreme Court had turned back contentions that the recording of a conversation by one of the participants or the overhearing of a conversation by a third party with the consent of one of the parties violated the fourth amendment.

In *Lopez* v. *United States,* 373 U.S. 427, 83 S. Ct. 1381, 10 L. Ed. 2d 462, an internal revenue service agent concealed an electronic device on his person and recorded his conversation with the defendant. The court rejected the defendant's argument that

this recording was an illegal seizure of his conversation, and, after noting that the agent could properly testify as to his conversation, added: "The Government did not use an electronic device to listen in on conversations it could not otherwise have heard. Instead, the device was used only to obtain the most reliable evidence possible of a conversation in which the Government's own agent was a participant and which that agent was fully entitled to disclose. And the device was not planted by means of an unlawful physical invasion of petitioner's premises under circumstances which would violate the Fourth Amendment. It was carried in and out by an agent who was there with petitioner's assent, and it neither saw nor heard more than the agent himself." Id., 439.

The court in *Lopez* relied on *On Lee* v. *United States,* 343 U.S. 747, 72 S. Ct. 967, 96 L. Ed. 1270, in which an undercover agent secreted a microphone on his person and engaged the defendant in a conversation during the course of which incriminating statements were made and transmitted to another government agent by means of a receiver tuned in to the microphone. In *On Lee,* as in *Lopez,* the court rejected the argument that these statements were seized in violation of the fourth amendment. Id., 750–55.

Although it might appear at first blush that the constitutional doctrines of *Lopez* and *On Lee* could not survive *Berger, Katz* and *Osborn,* these cases were harmonized by the Supreme Court in the 1971 case of *United States* v. *White,* 401 U.S. 745, 91 S. Ct. 1122, 28 L. Ed. 2d 453. In that case, the court held admissible testimony by government agents who conducted warrantless electronic monitoring of incriminating conversations between the defendant

and an informant who was wearing an electronic transmitter and who could not be located at trial.

In its discussion of *On Lee,* the plurality opinion in *White*[9] acknowledged that to the extent *On Lee* rejected the claim that there was no fourth amendment violation "because the informer had not trespassed when he entered the defendant's premises and conversed with him," it could not survive *Katz.* Id., 750. The court, however, cited an alternative ground for the holding in *On Lee* which could survive *Katz,* i.e., that the defendant was "talking confidentially and indiscreetly with one he trusted and he was overheard. . . . It would be dubious service to the genuine liberties protected by the Fourth Amendment to make them bedfellows with spurious liberties improvised by farfetched analogies which would liken eavesdropping to a conversation, with the connivance of one of the parties, to an unreasonable search or seizure." Id.

The court went on to explain (p. 751) the viability of *On Lee* and *Lopez* in the wake of *Berger, Katz* and *Osborn* as follows: "Concededly a police agent who conceals his police connections may write down for official use his conversations with a defendant and testify concerning them, without a warrant authorizing his encounters with the defendant and without otherwise violating the latter's Fourth Amendment rights. *Hoffa* v. *United States,* 385 U.S. 293, 300–303, 87 S. Ct. 408, 17 L. Ed. 2d 374. For constitutional purposes, no different result is required if the agent instead of immediately

[9] Mr. Justice White wrote the plurality opinion in which Chief Justice Burger, Mr. Justice Stewart and Mr. Justice Blackmun joined. Mr. Justice Black and Mr. Justice Brennan concurred in the result for reasons set forth in their individual opinions, and Mr. Justice Douglas, Mr. Justice Harlan and Mr. Justice Marshall each filed dissenting opinions.

reporting and transcribing his conversations with the defendant, either (1) simultaneously records them with electronic equipment which he is carrying on his person; *Lopez* v. *United States,* supra; or (2) carries radio equipment which simultaneously transmits the conversations either to recording equipment located elsewhere or to other agents monitoring the transmitting frequency. *On Lee* v. *United States,* supra. If the conduct and revelations of an agent operating without electronic equipment do not invade the defendant's constitutionally justifiable expectations of privacy, neither does a simultaneous recording of the same conversations made by the agent or by others from transmissions received from the agent to whom the defendant is talking and whose trustworthiness the defendant necessarily risks."

Thus, having considered the constitutional framework for wiretapping and electronic surveillance, we turn to the federal and state statutes here in issue.

## B

The present federal wiretapping and electronic surveillance statute, the Omnibus Crime Control and Safe Streets Act of 1968, Public Law 90-351, Title III, § 802, 82 Stat. 212, codified as 18 U.S.C. §§ 2510–2520 (hereinafter title III), was enacted in 1968 in an effort to establish guidelines which would pass constitutional muster in light of the fourth amendment guarantees set forth in *Berger, Katz* and *Osborn.* See *United States* v. *United States District Court,* 407 U.S. 297, 302, 92 S. Ct. 2125, 32 L. Ed. 2d 752; see also S. Rep. No. 1097, 90th Cong., 2d Sess., reprinted in 1968 U.S. Code Cong. & Admin. News 2264–68. The constitutionality of title III has generally been upheld. *United*

*States* v. *Sklaroff,* 506 F.2d 837 (5th Cir.), cert. denied, 423 U.S. 874, 96 S. Ct. 142, 46 L. Ed. 2d 105; *United States* v. *Ramsey,* 503 F.2d 524 (7th Cir.), cert. denied, 420 U.S. 932, 95 S. Ct. 1136, 43 L. Ed. 2d 405; *United States* v. *Martinez,* 498 F.2d 464, 467–68 (6th Cir.); *United States* v. *James,* 494 F.2d 1007, 1013 (D.C. Cir.); *United States* v. *Tortorello,* 480 F.2d 764 (2d Cir.), cert. denied, 414 U.S. 866, 94 S. Ct. 63, 38 L. Ed. 2d 86; *United States* v. *Cafero,* 473 F.2d 489 (3d Cir.), cert. denied, 417 U.S. 918, 94 S. Ct. 2622, 41 L. Ed. 2d 223; *United States* v. *Cox,* 462 F.2d 1293 (8th Cir.); *United States* v. *Cox,* 449 F.2d 679 (10th Cir.), cert. denied, 406 U.S. 934, 92 S. Ct. 1783, 32 L. Ed. 2d 136.

The purposes of title III, which are set forth in detail in the Congressional findings,[10] are two-fold: protecting the privacy of oral and wire communications while delineating on a uniform basis the narrow and clearly-defined circumstances and con-

[10] Section 801 of the Omnibus Crime Control and Safe Streets Act reads:

"On the basis of its own investigation and of published studies, the Congress makes the following findings:

(a) Wire communications are normally conducted through the use of facilities which form part of an interstate network. The same facilities are used for interstate and intrastate communications. There has been extensive wiretapping carried on without legal sanctions and without the consent of any of the parties to the conversation. Electronic, mechanical, and other intercepting devices are being used to overhear oral conversations made in private, without the consent of any of the parties to such communications. The contents of these communications and evidence derived therefrom are being used by public and private parties as evidence in court and administrative proceedings, and by persons whose activities affect interstate commerce. The possession, manufacture, distribution, advertising, and use of these devices are facilitated by interstate commerce.

(b) In order to protect effectively the privacy of wire and oral communications, to protect the integrity of court and administrative proceedings, and to prevent the obstruction of interstate commerce, it is necessary for Congress to define on a uniform basis the circum-

ditions under which an interception of such communications may be authorized. *United States* v. *Cafero,* supra, 500 n.8; see also 1968 U.S. Code Cong. and Admin. News 2153. To this end, Title III prohibits, on the pain of criminal and civil penalties, all interceptions[11] of oral and wire communications except those specifically provided for in title III, most notably those permitted to law enforcement officers when authorized by a court order in connection with the investigation of serious crimes set forth in 18 U.S.C. § 2516. *United States* v. *Giordano,* 416 U.S. 505, 514–15, 94 S. Ct. 1820, 40 L. Ed. 2d 341.

stances and conditions under which the interception of wire and oral communications may be authorized, to prohibit any unauthorized interception of such communications, and the use of the contents thereof in evidence in courts and administrative proceedings.

(c) Organized criminals make extensive use of wire and oral communications in their criminal activities. The interception of such communications to obtain evidence of the commission of crimes or to prevent their commission is an indispensable aid to law enforcement and the administration of justice.

(d) To safeguard the privacy of innocent persons, the interception of wire or oral communications where none of the parties to the communication has consented to the interception should be allowed only when authorized by a court of competent jurisdiction and should remain under the control and supervision of the authorizing court. Interception of wire and oral communications should further be limited to certain major types of offenses and specific categories of crime with assurances that the interception is justified and that the information obtained thereby will not be misused."

[11] "Intercept" is defined as "the aural acquisition of the contents of any wire or oral communication through the use of any electronic, mechanical or other device." 18 U.S.C. § 2510 (4). "Aural acquisition" has been defined literally as meaning "to come into possession through the sense of hearing." *Smith* v. *Wunker,* 356 F. Sup. 44, 46 (S.D. Ohio). The Connecticut wiretapping statute defines "intercept" slightly differently as "the intentional overhearing or recording of a wire communication through the use of any electronic, mechanical or other device." General Statutes § 54-41a (2). This difference in wording, however, need not be discussed in view of our resolution of this point.

Another practice not prohibited by title III is consensual recordings, i.e., an interception of a conversation made with the consent of one of the parties thereto. The pertinent portion of the act reads as follows: "It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire or oral communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception." 18 U.S.C. § 2511 (2) (c). The same rule applies to persons not acting under color of law. 18 U.S.C. § 2511 (2) (d). A reading of this statute makes it clear that the recording of a conversation by a party to it is an action which is permitted under this federal law. See *Smith* v. *Wunker,* 356 F. Sup. 44, 46–47 (S.D. Ohio) ; see also *United States* v. *Ransom,* 515 F.2d 885, 890 (5th Cir.). This conclusion is buttressed by an examination of the Senate Judiciary Committee Report, which states that 18 U.S.C. § 2511 (2) (c) "largely reflects existing law" and that "[w]here one of the parties consents, it is not unlawful," citing *Lopez,* supra, *On Lee,* supra, and *Rathbun* v. *United States,* 355 U.S. 107, 78 S. Ct. 161, 2 L. Ed. 2d 134. 1968 U.S. Code Cong. and Admin. News 2182.[12]

---

[12] In *Rathbun* v. *United States,* 355 U.S. 107, 78 S. Ct. 161, 2 L. Ed. 2d 134, the court stated (pp. 109-111) that the contents of a conversation overheard by a police officer on a telephone extension with the consent of the subscriber, who was also a party to the conversation, was admissible in a federal criminal trial, inasmuch as such a use of a telephone extension was not an "interception" within the meaning of § 605 of the Federal Communications Act of 1934, 47 U.S.C. § 605. See 4 Wharton, Criminal Evidence (13th Ed.) § 739; annot., 97 A.L.R.2d 1283. Recordings of conversations intercepted illegally under § 605 were held inadmissible in state courts in *Lee* v. *Florida,* 392 U.S. 378, 386–87, 88 S. Ct. 2096, 20 L. Ed. 2d 1166, which overruled *Schwartz* v. *Texas,* 344 U.S. 199, 73 S. Ct. 232, 97 L. Ed. 231, and brought this area of law into accordance

## C

For these reasons, then, it is apparent that in the present case the actions taken by the undercover officer in taping and transcribing his own conversations are not violative of the federal constitution,

with *Mapp* v. *Ohio,* 367 U.S. 643, 81 S. Ct. 1684, 6 L. Ed. 2d 1081, which overruled *Wolf* v. *Colorado,* 338 U.S. 25, 69 S. Ct. 1359, 93 L. Ed. 2d 1782, and expanded the application of the exclusionary rule to state as well as federal court proceedings.

Section 605 reads in pertinent part that "no person not being authorized by the sender shall intercept any communication and divulge or publish the existence, contents, substance, purport, effect or meaning of such intercepted communication to any person . . . ." Section 605 was amended by section 803 of title III of Public Law 90-351, which inserted the words: "Excepted as authorized by chapter 119, title 18" at the beginning of the section. The legislative history makes clear that this change was intended to make the new section a substitute and not merely a reenactment of § 605. By this new language, the amendment was designed to insure that the regulation of the interception of wire or oral communications would be governed by chapter 119 of title 18, i.e., title III of the Crime Control Act, which governs the procedure by which a warrant for electronic surveillance may be obtained by law enforcement personnel. 1968 U.S. Code Cong. and Admin. News 2196.

The legislative history also makes it clear Congress intended that law enforcement personnel were to be excluded from the purview of § 605. As the Senate Judiciary Committee stated: "The new section is designed to regulate the conduct of communications personnel. It also provides that no person not authorized by the sender shall intercept any radio communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person. 'Person' does not include a law enforcement officer acting in the normal course of his duties." Id., 2197. See *United States* v. *Hall,* 488 F.2d 193, 195–96 (9th Cir.); *Korman* v. *United States,* 486 F.2d 926, 932 (7th Cir.); *People* v. *Mahoney,* 47 Cal. App. 3d 699, 708–716, 122 Cal. Rptr. 174; *State* v. *McCartin,* 135 N.J. Super. 81, 87–89, 342 A.2d 591.

Since title III was in effect during all pertinent periods in the instant case, it is that statute which must govern the undercover officer's actions, not § 605. *Rathbun* is, nonetheless, instructive in the state of the law prior to the passage of title III and the decisions in *Berger, Katz* and *Osborn,* as well as the legislative intention behind the exemption for consensual recordings set forth in 18 U.S.C. § 2511 (2) (c).

nor are they unlawful under title III. Whether they are authorized under Connecticut's wiretapping and electronic surveillance statute is the question to which we now turn.

Connecticut's wiretapping and electronic surveillance statute, 1971 Public Acts, No. 68, codified as General Statutes §§ 54-41a—54-41s, became effective July 1, 1971, and is modeled after and closely resembles title III with respect to the criteria and guidelines which must be met in order for a state's attorney to obtain a court order authorizing wiretapping and electronic surveillance. These requirements, as set forth in title III, are not self-executing with respect to the states, and under 18 U.S.C. § 2516 (2) a state's attorney has the power to make an application for such an order only "if such attorney is authorized by a statute of that State." General Statutes § 54-41b was enacted to give state's attorneys such authority.

While Connecticut's statute resembles title III in many respects, it contains, however, none of the broad prohibitions against wiretapping and electronic surveillance which are contained in 18 U.S.C. § 2511 (1). Nor does it contain any of the exemptions, such as for consensual recordings, which are set forth in 18 U.S.C. § 2511 (2). The only statute which barred wiretapping during the times pertinent to the present case (August 25, 1971 through September 30, 1971) was former § 53-140 of the General Statutes, which provided that "[a]ny person who makes a connection, by wire or otherwise, with any telegraph or telephone wire, not owned or leased by him, for the purpose of obtaining information or listening to the transmission of telegraphic dispatches or telephone messages to which he is not entitled . . . shall be fined not more

than five hundred dollars." Plainly, this statute authorizes consensual recordings and is not inconsistent with title III or 47 U.S.C. § 605. Since a person is entitled to listen to his own calls, it is not a violation if he connects an electronic device to record them. *Lopez* v. *United States,* supra.[13]

Thus, there is nothing in the state statute which prohibits the undercover officer from making tapes of his own conversations and transcribing them for introduction into evidence. It is a fundamental axiom of statutory construction that criminal laws must be strictly construed, and the officer's actions would be illegal only if the statute made them so. *State* v. *Cataudella,* 159 Conn. 544, 555–56, 271 A.2d 99; *State* v. *Moreno,* 156 Conn. 233, 238, 240 A.2d 871; *Hartford-Connecticut Trust Co.* v. *O'Connor,* 137 Conn. 267, 274, 76 A.2d 9; *Pennington* v. *State,* 19 Md. App. 253, 277, 310 A.2d 817; see also 73 Am. Jur. 2d, Statutes, §§ 293, 295, 297; 82 C.J.S., Statutes, § 389 (b) (1). The Connecticut wiretapping and electronic surveillance statute is

---

[13] General Statutes § 53-140 was repealed effective October 1, 1971, but the prohibitions of the statute were carried over into the new Penal Code, effective that date. In particular, General Statutes § 53a-189 (a) provides that: "A person is guilty of eavesdropping when he unlawfully engages in wiretapping or mechanical overhearing of a conversation." The words "wiretapping" and "mechanical overhearing of a conversation" are defined to make it clear that the eavesdropping occurs only when there is an "intentional overhearing or recording of a conversation" which is carried out "by a person other than a sender or receiver thereof" and "without the consent" of at least one party thereto. General Statutes § 53a-187 (a) (1), (2). Thus, it is clear that one may tape one's own conversation, whether one is the caller or the one being called. As an added precaution, the legislature made it clear that General Statutes §§ 53a-187–53a-189 "shall not apply to wiretapping by criminal law enforcement officials in the lawful performance of their duties and does not affect the admissibility of evidence in any proceedings other than a prosecution for eavesdropping or tampering with private communications." General Statutes § 53a-187 (b).

permissive in the same sense as title III only insofar as it establishes standards whereby prosecutors may obtain court authorization for an electronic intrusion; it is not, however, prohibitory in the sense of title III, which contains a broad proscription against unauthorized and unexempted electronic interceptions. 18 U.S.C. § 2511. The only proscriptions in existence at the time of the present conspiracy were contained in former § 53-140 of the General Statutes, which does not prohibit parties from taping their own telephone conversations. For these reasons, we conclude that the undercover officer's actions were not prohibited by General Statutes §§ 54-41a through 54-41s, that this act therefore had no application, and that the trial court did not err in denying the defendant's motion to suppress the four tapes and transcriptions.

There is no error.

In this opinion the other judges concurred.